## Brewer *v.* Jacobs and another.

*(Circ t Court, W. D. Tennessee. March 15, 1884.)*

1. Malicious Prosecution—Probable Cause—Malice—Advice of Counsel.
   In suits for malicious prosecution the advice of counsel is referable rather to the issue of malice than that of want of probable cause. If the jury can see, from all the facts, that the suit was malicious, notwithstanding the advice of counsel, that fact affords no protection to the plaintiff in attachment, and if the court can see that, notwithstanding the advice, it was unreasonable to believe that a ground of attachment existed, that fact of itself does not constitute probable cause.

2. Same Subject—Malice Defined.
   Where the action is for the malicious prosecution of an attachment suit without probable cause, malice does not necessarily mean alone that state of

mind which must proceed from a spiteful, malignant, or revengeful disposition, but includes as well that which proceeds from an ill-regulated mind, not sufficiently cautious, and recklessly bent on the attainment of some desired end, although it may inflict wanton injury upon another.

3. SAME SUBJECT—DAMAGES.
Where an attachment is levied upon a growing crop of cotton, whereby the tenants and laborers of the plaintiff were so demoralized that they abandoned their crops, from distrust of his ability to carry out his contracts with them for supplies, and the crops were thereby injured, the jury should find their verdict for the actual damages to the crop from this cause, but are not confined to this element, and may assess the damages so as to compensate the plaintiff for the injury; but in no case should this power of the jury operate to make the verdict excessive or oppressive.

4. SAME SUBJECT—EFFECT OF THE JUDGMENT IN ATTACHMENT—EVIDENCE.
Whether the judgment in the attachment suit, in favor of the defendant to that suit, is evidence tending to show want of probable cause, in an action for malicious prosecution, not decided; but it is the only competent proof of the fact that the attachment was ended in favor of the plaintiff in the suit for malicious prosecution, and in this case was confined to that use.

5. NEW TRIAL—OBJECTIONS TO JUROR AFTER VERDICT—NONAGE—NOT FREEHOLDER OR HOUSEHOLDER—SUBSTITUTED JUROR—TENNESSEE PRACTICE.
The objection that one of the jury was not of lawful age, and was not a freeholder or householder, comes too late after verdict, in Tennessee practice, which the federal court follows, unless something more is shown vitiating the verdict than that the juror was so disqualified. And if one appear who is not summoned to serve as a juror, in place of one drawn from the box, it is doubtful if the objection be good after verdict.

6. SAME SUBJECT—FEDERAL PRACTICE—WAIVER OF OBJECTIONS.
The practice of the federal court is to examine each juror as he is called, touching his statutory qualifications, upon his oath, and if he answers satisfactorily, to accept him for the term. But in effect the jury is tendered to the parties in each case as it is successively called for trial, and they must then challenge for cause that a juror is too young, or otherwise similarly disqualified, or the objection will not be entertained after verdict, although the defect was wholly unknown to the parties at the time the jury was sworn.

7. NEW TRIAL—AMENDMENT OF DECLARATION AFTER ARGUMENT BEGUN.
Where the proof had been closed and the argument was in progress, the court allowed the declaration to be amended so as to enlarge the averments in relation to the damages sustained by the plaintiff, and for this error a new trial was granted.

Motion for New Trial. Action for malicious prosecution of an attachment suit.

The plaintiff, in the year 1880 and before, was carrying on a cotton plantation in Arkansas, on the Mississippi river, below Memphis, Tennessee. As usual in that business, he had an arrangement with Richardson & May, of New Orleans, to furnish him money and supplies for the plantation, securing them by a mortgage on his interest in the crops, stock, farming implements, etc. A part of the plantation—about 90 acres—was known as the "Malone Place;" there being 600 acres in cultivation in the whole farm. With the consent of Richardson & May, the plaintiff made an arrangement with the defendants for supplies to be furnished at Memphis, on the security of the crops on the Malone place, and when the account was settled there was a balance due the defendants of about $400.

In the following year, 1881, the plaintiff made another arrange-

ment with Richardson & May for advances and supplies for that year, executing a mortgage as before. This mortgage was sent by Richardson & May to Brewer, to be by him executed and recorded in the county where the land was situated. He did not file it for record immediately, nor until sometime in May or June, when he sent it to the clerk of the county to be recorded, either unsigned or not properly acknowledged, and the clerk did not record it. During the spring the plaintiff desired to make an arrangement with defendants similar to the one he had made before, and, according to defendants' contention, promised to make to them a mortgage on the Malone place, which he told them was not included in the Richardson & May mortgage of that year, and to have the tenants of that place join in the mortgage, as he was to get the supplies for them. According to the plaintiff's contention, he only promised, with Richardson & May's consent, to ship to defendants the cotton grown on the Malone place. The defendants refused, as they contend, to advance on any other terms than security for the old balance as well as new advances, but, under pressure and a promise to send up the mortgage, advanced $75, and agreed to advance $125 additional when the mortgage was made.

The plaintiff drew some small orders, which were refused payment by defendants. The parties became involved in an acrimonious controversy as to the terms of the agreement, the details of which it is not necessary to report, except that the plaintiff tendered a check on Richardson & May for $75,. for the money paid him, and offered to abandon the agreement, which was refused for some reason, and afterwards offered, as he contends, a mortgage on cotton-seed, if not included in Richardson & May's mortgage, but ultimately signed a mortgage drawn up by defendants before a notary, which they did not take because of some complaint of a want of Richardson & May's consent.

These negotiations for settlement and compromise, about which there was great conflict in the proof, as well as about the original agreement, all failed. The Richardson & May unexecuted mortgage fell into the hands of defendants, and observing that the Malone place was included in it, the defendants, as they contend, conceived this to be a fraud upon them, and applied to their lawyer, stating the facts and showing the unexecuted mortgage. There was a contention in the proof as to whether all the material facts were stated, but the lawyer advised an attachment. The defendants made the necessary affidavits under the attachment laws of Arkansas that the plaintiff was about to fraudulently convey his property, and on July 16, 1881, the attachment was levied on the growing crops of the plaintiff, cultivated by day labor, on his horses and mules and gin-stands, and by garnishment on the shares of crops due the plaintiff from the croppers on share. The horses and mules were left with the plaintiff by the sheriff, and an agent was appointed to watch the

crops, some of which were afterwards seized on an execution in favor of defendants for their debt, and sold to satisfy it.

There was much proof and conflicting testimony as to the conduct of the sheriff and a brother of one of the defendants about the business of making the levy, and the subsequent proceedings in watching the crops. The attachment suit was removed by the plaintiff from the state court to the federal court in Arkansas, where, on the trial, it was decided in his favor. He therefore brought this suit for the wrongful suing out of the attachment, maliciously and without probable cause, alleging that the negro laborers were so demoralized by the levy of the attachment that they abandoned the crops, which fell short for want of work which he could not supply, under the circumstances of loss of credit, time of the season, want of confidence in his ability to carry out his contracts with them, want of supplies for their support, etc. Damages were also claimed for excessive levies.

About all this there was much conflict in the proof, the defendants contending that the property was left with the plaintiff; that the desertion of the laborers proceeded from the plaintiff's bad management and conduct towards them, if there was any desertion at all, which was denied. There was a verdict of $2,250 for the plaintiff.

When the case was called for trial, counsel for defendants stated that they had an arrangement with one of the counsel for plaintiff, who was a member of congress, to pass it until his return from Washington, but that if the plaintiff insisted on a trial the defendants would be ready on a day named, to which the trial was adjourned. On that day the plaintiff moved to amend his declaration by adding a more specific allegation of special damages, to which the defendants objected unless the case was continued. To avoid a continuance, plaintiff withdrew his motion to amend and the trial proceeded, a large number of witnesses being examined on both sides.

After the argument was commenced, the jury was retired, and plaintiff renewed his motion to amend the declaration on the ground that, after the time and expense of the trial, it was probable the result would be, at most, only a nominal verdict for the plaintiff or a verdict for the defendants, because of the want of sufficiently full allegations of the special damages relied on in the proof. The court stated that the proof had developed a substantial controversy between the parties which mainly depended on the view to be taken by the jury of the facts as they should find them in the great conflict of testimony, and that, as the case had progressed so far, it seemed better to submit it to the jury on a declaration sufficient to raise the issues than to force a nonsuit which the plaintiff could take, under the practice, at any time before the case was submitted to the jury, or to enter a mistrial and continue the case, as the defendants insisted should be done. But as the plaintiff had deliberately gone to trial on his declaration, it was doubtful whether he should be allowed to now amend, notwithstanding the liberal provisions of the statute,

except under the penalty of a continuance and costs; and therefore the amendment would be permitted for the sole purpose of reaching the judgment of the jury on the facts, but reserving to the defendants, on the motion for a new trial, every question they could make on the motion to amend, as if this course had not been taken. Whereupon the amendment was made, and there was a verdict for the plaintiff.

On motion for a new trial, the defendants produced affidavits of many witnesses, not examined at the trial, to show that they could have made a better case if the declaration as amended had been originally filed in that form, or if they had been made at an earlier stage of the proceedings. The plaintiff presented counter-affidavits, and insisted that the large number of witnesses produced at the trial and the fullness of the proof showed that they were fully aware of the real issues, and were not surprised or taken at a disadvantage by the amendment.

Another ground of a motion for a new trial was that one of the jurors, James Gray, was a minor, and disqualified, under the statute, as a juror; that James Gray, Sr., had been really drawn from the box, and this James Gray, Jr., had in some way become substituted for the other; that the defendants were not aware of these facts till after the trial, and that they did not challenge him because of their ignorance of the fact, and because, by the practice of the court, each juror was examined when called as to his qualifications, and they were relying on truthful answers by the jurors at the time they were received for the term by the court. Affidavits were presented to sustain this ground of the motion.

On the trial of the case, the court, HAMMOND, J., charged the jury as follows:

### 1. *The Affidavit.*

*Gentlemen of the Jury:* Apart from any question of the effect of the judgment of the court in Arkansas against the attachment there can be no doubt, on the facts proved in this case which are not at all disputed, that the statements of the affidavit for attachment were untrue, and the plaintiff has shown by the proof here that there was no legal ground for the attachment of his property under the laws of Arkansas.

### 2. *Probable Cause.*

The court does not hesitate to assume the responsibility of saying to you that—on the facts proved in the case about which there is no dispute, and taking them to be just as the defendants claim they were, where there is any conflict—there was no probable cause whatever for the attachment.

### 3. *Malice.*

But the entire absence of probable cause for the attachment does not of itself entitle the plaintiff here to recover damages against the defendants for suing the attachment. The law requires more than this. There must be also malice on the part of the defendants proved to your satisfaction. The want of probable cause and malice must co-exist to sustain the action. You will have observed that the declaration charges, as it must, that the attachment was maliciously and without probable cause prosecuted by the defendants. The court has on the facts determined that there was no probable cause, and you

alone must determine whether there was any malice; with that question the court has nothing to do. It is a mere question of fact, and the court can do no more than point out to you the process of resolving it when you come to consider it. The first inquiry you will naturally make is, what does the law mean by malice? Ordinarily, we use this word to designate general malevolence, ill will, or unkindness towards a particular individual; but in law it signifies rather the intent from which flows any unlawful and injurious act committed without legal justification. It is the conscious violation of the law to the prejudice of another. It is express malice where the party evinces an intention to do the wrong, and implied, where it is inferred from the character of the facts proven. As applied to controversies like this we are now trying, where a party is sued for the malicious prosecution of a suit against another, without probable cause for bringing the suit, the term does not necessarily mean that which must proceed from a spiteful, malignant, or revengeful disposition, but includes as well conduct injurious to another, though proceeding only from an ill-regulated mind, not sufficiently cautious before it occasions an injury to another, and bent on the attainment of some desired end; such, for example, as the collection of a just debt, without due regard to the lawful rights of that other. Juries may infer this kind of malice from facts and circumstances proven in the case which show that the party acted with a reckless disregard for the rights of others, and was willing, in order to accomplish the desired end, to inflict a wanton injury. Malice is never in my judgment inferred as a matter of law in cases like this,—if it be in any case,—be the facts what they may. It is always a question solely for the jury to say whether it existed in the particular case, and they alone are authorized to make the inference, according to their judgment, and their experience and knowledge of human affairs. The court does not intend to review the facts in this case, resting as they do in the testimony of many witnesses on both sides, nor to present them to you by suggesting the conflicting views taken of them by counsel. They have been thoroughly and well argued before you, and the court might by inadvertence or omission give undue weight to one side or the other by such a process. The question for you to determine is whether there existed on the part of the defendants that kind of malice which the court has endeavored to explain. If it did, the defendants are liable in this action for damages. And you can readily see how important the injury is to the parties, and how careful you should be in deciding it. The court has adjudged that there was no probable cause for bringing the attachment, because, taking the defendants' own testimony to be absolutely true, there was no ground under the statutes of Arkansas for the attachment; and, besides, the plaintiff has proved that the alleged ground set out in the affidavit was untrue, and there is no pretense of any other. But, inasmuch as this absence of probable cause is only one element of the plaintiff's case, he cannot recover unless his other averment of malice is found by you to be true. If, therefore, you find there was no malice, your verdict must be for the defendants. If you find there was malice, your verdict must be for the plaintiff.

#### 4. Advice of Counsel.

But it is the duty of the court to instruct you as to one fact in this case more specifically than it has been indicated will be done as to others. It is proved, indisputably, that before bringing the attachment the defendants consulted a reputable lawyer, who advised the attachment. What is the effect of that fact to have with you in determining whether there was malice? Like all other facts in the case it is to have just that effect which you, taking all the facts together, choose to give it. It is for your wisdom to determine its weight and value, under the circumstances of this case as bearing on the question of malice. No isolated fact is to determine that issue, but on all the facts as proved, you are to determine it. Now, take the fact of an entire ab-

sence of probable cause, for example, and consider it. It is sometimes said that the law infers malice from the want of probable cause, but it would be better to say that any jury, acting on its own experience of human nature and on the experience of all men, is apt to decide, where a man injures another without probable cause, that he acts either malevolently or with a reckless disregard of the rights of others, and therefore maliciously, in the eyes of the law. But if the other facts in the case show that this is not a fair and just inference, the jury will not make it, even though there was no probable cause for the suit complained of, and even though it has been so decided by the court trying the case, or the court trying the subsequent case for malicious prosecution. In other words, it is for the jury to say, on all the facts, whether the want of probable cause shows malice. Precisely in the same way, to take another example, do the jury consider the fact of advice of counsel. Acting on their own and the experience of all men, the jury is apt to decide that where a party, contemplating an attachment of his debtor, takes the pains to inform himself of all the facts which, by reasonable diligence, he can obtain, lays them all truthfully before his counsel, a reputable lawyer, omitting none, and, taking his advice, brings the suit, in the honest belief that he has probable cause for the attachment, and acts *bona fide* on that belief, there is no malice, although the suit fails, and, as a matter of fact, the advice was erroneous, and there was no probable cause. But if the other facts in the case show that, notwithstanding this advice of counsel, there was malevolent intention to injure, or any unreasonable and reckless disregard of the rights of others; that the true facts were not stated, but false statements made; that there was no honest belief in the existence of a cause of attachment and no *bona fide* reliance on the erroneous advice, but that it was sought or instigated merely as a cloak to do a wrong and thereby obtain an advantage for himself,—the jury is not apt to permit the advice to override all the other facts and protect the wrong-doer. The advice of counsel in such cases, when taken, as indicated, under circumstances which may fairly be presumed to have led to the bringing of the attachment suit, *prima facie* relieves the party from the imputation of malice, and imposes the duty on the other party—the plaintiff here—to remove by proof those presumptions flowing from the seeming situation of the parties, and to require him to bring home to the defendants the existence of malice as the true motive of their conduct. Beyond this extent no presumption can be permitted to operate, much less to be made to sanctify the indulgence of malice, however wicked, however express, under the protection of legal forms and the advice of counsel. In other words, where the jury finds in all the facts that malice exists, notwithstanding the advice of counsel, that advice is no protection where there is an absence of probable cause. If there be probable cause for the suit, of course, malice is immaterial, for a man may always prosecute a suit if he has probable cause, no matter how malicious he may be, and it is only where there is no probable cause, as in this case, that malice is material. You see, then, gentlemen of the jury, how important your functions are in determining this controversy. You should act cautiously, deliberately, and wisely, with that impartial care that gives weight to your verdict, and the more so because under our constitution and laws you are the sole tribunal to decide this controversy, and when you so act no court is authorized to disturb your verdict.

### 5. *Damages.*

If you conclude that the defendants acted maliciously, your verdict will be for the plaintiff; and the question of damages arises, and must, also, be decided by you, like the other, on all the facts in the case pertinent to that subject. No expenses of the attachment suit, outside of the regular costs of it, or of this suit outside of the regular costs and outside of counsel fee, have been proved, and therefore there is no consideration to be given to any supposed

damage on that score. The whole damage sought to be established consists in injury to the plaintiff's crop by demoralizing the tenants and laborers on his plantation. If you find that the levying of the attachment created a distrust among the plaintiff's tenants and laborers of his ability to carry out his contract with them, and that on that account they left the place or neglected the crop so that it was injured; that the levying of the attachment impaired the plaintiff's financial credit and embarrassed him in procuring supplies and laborers to take the place of the others or to furnish those that remained, and that by reason of this loss of labor and credit his crop was injured, you should estimate the damage from due proof, and allow it in your verdict. If, however, you find that the attached mules and other property were left in plaintiff's possession with freedom to use, as before the attachment; that the officers and agents of the plaintiff were careful to obviate any distrust among the laborers and tenants by explaining to them that they were not to be disturbed, and as a fact they did not abandon the crop or neglect it, or neglected and abandoned it for other causes, such as the conduct of the plaintiff towards them, or from their own laziness and want of a sense of obligation to contracts; or that the crop was short—if short it was—from drouth or other cause except demoralization by the attachment,—the damages can be at most only nominal; that is, for a small sum, which, while it vindicates the law, shows that the plaintiff was not, in fact, damaged. If he sustained no damage, your verdict should be only for this small and nominal sum, although the attachment was malicious and wrongful; and if other causes combined to injure his crop he should be allowed damages only for so much of the injury as was caused by the attachment. If you find, however, that there was actual damage more than nominal, then you are not confined, in your verdict, in a case like this, to actual damage, but may add such further sum as you may determine to compensate the plaintiff for the wrong done him. The law books call this additional sum by various names, such as punitive, exemplary, or vindictive damages, and sometimes "smart money." And it is sometimes said the jury may use this power to award damages to vindicate the law and deter others from wrong, and hence these names for the additional damages; but you should not be misled by these terms, or the principle of punishment, into an unjust verdict. Even in courts punishing crimes, our constitution forbids excessive fines and cruel or unusual punishments, and certainly in civil damages the jury should not exercise its undoubted power of assessing them oppressively or excessively; and this court would not, for a moment, tolerate an excessive verdict for damages awarded by way of punishment. If you find there was no injury, your verdict will be nominal, as you cannot assess punitive damages where there was no injury, or only one too small for the law to notice; but if you find actual damages, you may allow these alone, or such additional reasonable sum as you choose. If you find there was no malice, your verdict will be for defendants, no matter how great the injury may have been.

*L. Lehman* and *Geo. Gantt*, for the motion.

*Young & Martin* and *Luke E. Wright*, contra.

HAMMOND, J. The exceptions to the charge of the court are not, in my judgment, well taken. We may lay aside the doubtful question of the precise probative value of the record of the proceedings of the United States court in Arkansas in its relation to the issue of a want of probable cause in this suit. All agree that it may be used to prove —and that fact must be always so proven—that the attachment suit resulted in favor of the plaintiff here. Whether it can have any further effect, and be considered as tending to prove that there was no probable cause for the attachment, it is now immaterial to inquire,

because the court confined it to the certain use, and did not consider it in the other connection. Under the statutory regulations concerning the wrongful suing out of attachments in Tennessee, such a record has a conclusive effect to establish a want of probable cause in a suit for the statutory damages; but this is not that kind of suit, nor are we aware of any similar statute in Arkansas. But, aside from the judgment in that court, it is absolutely proved in this case that there was not the shadow of a cause for the attachment. The affidavit was wholly false. Brewer was not about to fraudulently convey his property. It is conceded that there was no other conveyance about to be made except the Richardson & May mortgage, and the affidavit was based alone on that. But that mortgage was a perfectly fair and honest one, and is the same kind in universal use in this valley between the planter and his supply merchant, and has been, time and again, sustained by the courts of Arkansas. This being so, it was plain to the court that there was no probable cause for suing out the attachment. There was no doubt a confusion of ideas on the part of the defendants and their then counsel. They conceived that Brewer had misrepresented and deceived them, and was acting dishonestly about their agreement with him, and this, coupled with a belief that if the defendants could levy an attachment before the Richardson & May mortgage was properly executed their lien would be the better, no doubt instigated the attachment. This deceit, however, even if it existed, was no ground for attachment; and it requires but little discrimination to see that the issue of probable cause is not in the least aided by these facts. It depends entirely upon the validity of the Richardson & May mortgage, which was the conveyance alleged to be fraudulent.

In ordinary prosecutions for crime, or in ordinary process for civil suits, what is a probable cause of action or prosecution has, perhaps, a much wider scope of inquiry than in suits where the grounds of action by extraordinary process are defined by statutory law. The inquiry here is whether defendants had probable cause to believe that they had good statutory ground of attachment, and this depended wholly on that mortgage and on nothing else, since no other ground was pretended to exist or be set up in the proof. There could be no probable cause of action in a case like this, unless there was a probable ground for attachment under the statute prescribing that remedy.

The only question, then, for the jury was that submitted to them—whether the attachment was sued out maliciously. No exception was taken to the definition of malice which was given to the jury, but great complaint was made that the question of probable cause, as based upon the advice of counsel that an attachment would lie, was not submitted to them. In effect, this exception is that the court refused to adopt the theory of defendants, to support which there is no doubt some authority, that the advice of counsel furnishes probable cause for proceeding by attachment, and that, when given under the

conditions laid down in the authorities, it is an absolute protection in a suit for damages. I do not think so; nor are we committed to this doctrine by the expressions used in *Kennedy* v. *Meacham*, 18 FED. REP. 312. There the plaintiff was suing for the statutory damages allowed by the attachment laws of Tennessee for wrongfully suing out the writ, and the court was excluding from the jury the claim for punitive damages. There was no doubt that the ground of attachment in that case was perfect, the defendant being a non-resident, and the consideration was whether the attachment plaintiff was maliciously suing on a false claim of debt or pursuing a lawful remedy to collect a debt in good faith believed to exist. The court was stating a general principle, and was not called on and gave no attention to its precise character or limitations.

Here the contention is that in all cases where there is no concealment or omission of material facts, the advice of counsel furnishes probable cause for the suit. It may furnish a reasonable belief in the existence of a cause or ground of attachment which would show a state of mind in the attachment plaintiff that would altogether negative the existence of that condition of his mind which the law denominates malice. But how can the ill-considered, erroneous, ignorant, or, it may be, sound advice of a lawyer strengthen or add anything to the cause or ground of attachment? That depends on the facts, and wholly on them. Generally, it depends wholly on the situation and conduct of the defendants. If that situation and conduct be well and accurately known or defined, and susceptible of satisfactory proof of facts sufficient to maintain the plaintiff's suit, there would be a good cause of action; while if they be doubtful and equivocal, or proof of them difficult and uncertain, there would be a probable or possible cause of action. It is in this direction we must look for a solution of the issue of probable cause, and the advice of lawyers can neither add to nor take from the other facts of the case their force in the process of reasoning necessary to determine it. The cause of action is neither better nor worse after advice of counsel is taken. The client may not understand the bearing of the facts on his legal rights, nor whether he has a cause of action at all, and being advised that he has, by counsel of repute, may reasonably believe that it is so, and safely bring his suit if the facts plausibly support it. But this surely can neither enlarge nor diminish his legal right as found in the facts, nor so affect, let us say, the statute by which his cause of action is precisely defined, as in this case. If the facts do not fall within it, the statute gives no ground of attachment, and a reasonable belief that his lawyer will properly construe the statute, or wisely determine the application of the facts to it, can give the client no other ground of attachment than he had before,—neither one that is probable nor of any other degree.

In the very nature of the case, it seems to me, the advice of counsel is properly referred to its influence on the plaintiff's state of

mind on the issue of malice or no malice on his part, and not to the grade or degree of plaintiff's cause of action on the issue of its being probable or improbable as a ground for the attachment. It is an important distinction, because in the one view it becomes, on admitted facts, a question of law for the court, with the result that whenever the court sees that reputable counsel was sought, that all facts were stated, and nothing was concealed which due diligence would develop, it must direct a verdict for the defendant upon the ground that probable cause has been shown *as a matter of law*, no matter what the other facts may be, or how preposterously wrong was the advice of the lawyer or grievous the damage done the plaintiff. This is a very shocking result, to my mind, and seems to be offering a premium for ignorance, to say nothing of the unsatisfied wrongs of the injured defendant in attachment; for the attaching plaintiff would be wiser to seek an ignorant, careless, or reckless lawyer, and bring his malicious suit for the advantage of probable success in the lottery of litigation or the coercion of a compromise, or to gratify his malice pure and simple, than to seek a more prudent counselor who would carefully advise him against the attachment. On the principle contended for, he would be equally safe in the hands of either against any claim for damages by the injured adversary party, and he might as well take the chances of gaining something by the attachment.

Nor does the rule that the advice must be that of a *reputable* lawyer furnish any guaranty against this result. Theoretically it might, but practically it is of little value, for reasons that are plain to all who are acquainted with the looseness with which access to the ranks of the legal profession is guarded, and the difficulty of disrating any lawyer from the character of being *reputable* as to his intellectual and professional acquirements. The effort of any party to prove that the lawyer giving the advice was not, *in fact*, nor reputed to be, one of sufficient knowledge and skill to give reasonable counsel, would be so utterly hopeless that, in effect, the theory fails to furnish any security whatever against incompetent advice.

Criticism may pronounce this a humiliating statement, but that kind of criticism deals, like the theory under consideration, with presumptions and assumptions not altogether founded in fact. A plaintiff in the action for malicious prosecution, who should challenge the reputation of the lawyer giving the defendant the advice, would find himself trying another case than his own, which would at once attract attention by the desperate character of the enterprise, and with a success much more rare than that attending similar attacks on the character of witnesses with respectable surroundings and many friends. The courts have recognized this difficulty, and shrink from the doctrine that advice of counsel is an absolute protection, which accounts for the serious difficulty of determining, in suits like this, precisely what effect the advice of counsel shall have to protect the

defendants from the consequences of a wrongful resort to the process of attachment. When the principle was established the whole number of lawyers was small, and incompetency to give safe advice so rare that the reason for the rule was substantially sound. With increasing numbers and decreasing scrutiny into the qualifications of those "called to the bar," this reason has not so entirely failed as to invoke the maxim that "when the reason of any law ceases, so does the law itself," and the courts cannot abrogate the rule, but they can guard it from abuse by confining its operation within the limits prescribed by law. It never did extend as far as defendants here claim, because tnis mode of redress for malicious prosecutions was never confined to those cases alone wherein the offending plaintiff did not take the advice of reputable counsel, and the rule cannot be properly construed to offer such a premium for reckless professional advice.

On the other hand, if we refer the advice of counsel to the issue of malice, it becomes a fact to be considered by the court or jury along with other facts in the case in determining that issue. It may or·may not conclude the issue in favor of the attaching plaintiff, but in all cases, in the absence of countervailing facts, it affords as absolute protection to him as when referred to the issue of probable cause. The charge presented the case to the jury in this view of the law with the most scrupulous care to give the defendants the fullest possible benefit of the fact that they consulted reputable counsel, but the court refused to charge that this fact of itself and by itself afforded absolute protection. There were other facts which no doubt led the jury to believe that there was malice in the legal sense, if not in a larger sense, and the objection to the charge really is that it did not end the case in favor of the defendants by exaggerating the importance of the advice of counsel into a complete protection.

This view which the court took of the matter is supported by the thoroughly convincing commentary of Professor Tiedeman in his note to *Sharpe* v. *Johnstone*, 21 Amer. Law Reg. (N. S.) 576, 582. He cites the authorities extensively, and it is not necessary to enumerate them here. It is not to be understood that the facts and circumstances relied on to show probable cause must be found always to exist in such a state of certainty as to establish the defendant's probable guilt of the offense or liablity to the cause of action; nor that the element of belief, on the part of the prosecuting plaintiff or his lawyer, is eliminated from the inquiry as to probable cause. It may be that the defendant is not guilty, or that there is no ground of attachment, and that more careful and intelligent minds would readily detect the weakness of the case and groundless character of the accusation, or that better information would have developed such weakness. But still the proper inquiry is—Would a reasonable man have brought this suit? This involves necessarily a judicial inspection of the conduct of the prosecuting plaintiff as to his diligence in ascertaining facts, his intelligent comprehension of them, his fairness in dealing with them,

his prudence in asking professional advice, and all considerations entering into the character of his conduct about the matter, pretty much like the same inspection that goes on in determining the other issue of malice on his part. But we need not confuse the two branches of the case, albeit the processes of adjudging them be the same.

If the facts and circumstances as proven, including the advice of counsel, would excite belief in a reasonable mind of the existence of a ground of attachment, then there is probable cause for his conduct in bringing the suit, though there be no good ground of attachment, and the question is for the court or jury, or both, according to well-understood circumstances. This does not mean, however, that *unreasonable* belief can be converted into that which is *reasonable* simply by advice of counsel, regardless of all bearing of the other facts on the question. As it was put to counsel at the argument, no amount of reputation on the part of the lawyer would excuse the client if he brought an attachment upon a ground wholly outside of the statute; as if, for example, he should be advised that all conveyances of property while a man was in debt were fraudulent, or that all men who wore blue shirts might be attached. It is not reasonableness to the plaintiff's mind which is a test of the quality, but reasonableness *as a matter of law*, to be determined, not by the strength of that particular mind, nor yet by the nature and character of the advice given to it, but by the legal test in all such inquiries, here as elsewhere. And this is that belief which would be generally entertained by prudent and cautious minds acting with ordinary or average intelligence in such matters on the facts within the knowledge of the prosecuting plaintiff.

The supreme court, in *Wheeler* v. *Nesbit*, 24 How. 544, has defined probable cause to be "the existence of such facts and circumstances as would excite the belief, *in a reasonable mind*, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." Or, negatively, in another place in the opinion, "that he had *no sufficient reason* to believe him to be guilty." A *reasonable* mind is a sensible one, fairly judicious in its action, and at least somewhat cautious in reaching its conclusions. Assuming, then, as was done in charging the jury, that the defendants believed that they had a probable cause of action by attachment, or, to present it specifically, that they believed that Brewer was, in the language of their affidavit, "about fraudulently to convey his property," does that *belief* protect them? Mere belief will not do. It is agreed it must be honest and sincere, but under the above definition it is more important that it should be *reasonable*. However honest or sincere, and whether produced by advice of counsel or otherwise, surely *sincerity* is not synonymous with *reasonableness*. The belief may be never so sincere and yet unreasonable. As we cannot substitute sincerity for reasonableness in the definition, the real question is—Does advice of counsel of itself, under the given con

ditions of the rule, always and conclusively prove *reasonableness* as a quality of a sincere belief in the cause of action? It must be admitted that some cases so hold; some, however, do not. With all deference and presumptiously, perhaps, my mind would not, philosophically considering it, admit the theoretical soundness established by an affirmative answer to this question; but aside from this, as a legal proposition, the answer must be in the negative for the reasons already stated, namely, that the other facts may be of a character to demonstrate conclusively that notwithstanding the advice of counsel the prosecutor was unreasonable in entertaining such a belief. This case fully illustrates this, and the conduct and bearing of the defendant, who instigated and managed the attachment suit, shown in his demeanor, on the witness stand as elsewhere, from the beginning of that suit, plainly indicated that it was he who contrived this scheme to circumvent Brewer and force him to accept his own terms, and that he pursued it with a most reckless energy that needed no advice of counsel to support or stimulate it; and it may well be doubted if it could have tolerated any advice of counsel which would have checked it.

There was no dispute whatever about the facts bearing on the grounds of the attachment. The question of reasonable belief depended wholly on undisputed facts, and was properly determined as a question of law. There was nothing the matter with or suspicious about the Richardson & May mortgage. It was the same as that of the year before. Defendants knew it had been given, and both sides believed it had been properly executed and registered when the agreement about which the controversy arose was made. The accidental circumstance that it had not been properly executed did not invalidate it, nor make its proposed completion a ground to excite reasonable belief that it was fraudulent, or, in the language of the attachment affidavit, that Brewer "was about to fraudulently convey his property." The defendants knew as well as anybody that this mortgage was not fraudulent. They take such mortgages in their own business, and wanted one just like it from Brewer on a part of the same place, and his refusal to give it was their chief cause of complaint. It was unreasonable, then, to believe it a good ground of attachment that Brewer was about to complete the Richardson & May mortgage, and no advice of counsel on the facts of this case could make it more reasonable to entertain such a belief. The alleged misrepresentations, deceit, and bad faith in refusing to carry out his agreement with defendants, did not subject Brewer to attachment, and no reasonable man, with or without the advice of counsel, could say that the alleged deceit furnished any support for the affidavit that Brewer was "about to fraudulently convey his property," which was an entirely different thing, and had no connection with the deceit. The court having determined that this was unreasonable belief, as a matter of law, it had no occasion to submit the question of probable cause to the jury, there being no disputed fact bearing on that question.

The charge is also supported by the case of *Stewart* v. *Sonneborn,* 98 U. S. 187. There was no dispute here about the belief of the attaching plaintiffs as to their cause of action, nor as to the facts on which they formed their belief. They admitted that they based the affidavit alone on the Richardson & May mortgage, and the only question was whether the belief in it as a cause of action was reasonable; wherefore the remark of the court in that case, that the defendant's "belief was always a question for the jury," has no application here. It is conceded that they had a belief that the Richardson & May conveyance would be, under the circumstances, "a fraudulent conveyance," but this was held by the court to be unreasonable. The instruction to the jury in that case on the subject of the advice of counsel, for the refusal of which the court below was reversed, treated the advice as belonging to the issue of malice. *Stewart* v. *Sonneborn, supra,* 196.

The charge is also supported by the case of *White* v. *Nicholls,* 3 How. 266. It is true that was not a case of malicious prosecution, but of libel, in which the defense was a privileged communication. But the principle seems the same, and the method of submitting the question of malice to the jury strikingly analogous, if we place the advice of counsel on the same footing as a privileged communication in the law of libel was there placed. The analogy appeared to me so complete that the charge under review is somewhat a paraphrase of the opinion of the supreme court in the libel case. At all events, the result of the application of the principle of that case to this question was so entirely satisfactory that the case gave me the most thorough confidence in the correctness of the charge, and determined its adoption in a perplexing state of mind as to the conflict and confusion of authority. *White* v. *Nicholls,* 3 How. 266, as reported in the original edition; S. C. as reported in Law Pub. Co. Ed.

This treatment of advice of counsel, in suits for malicious prosecution, removes the great injustice of permitting it to become an impregnable fortress behind which willful injury finds perfect immunity from redress. The ordinary remedies of the law afford abundant means for the collection of debts or breaches of contract, and those which are extraordinary, while they are not to be illiberally treated, should be confined to cases wherein they are applicable, and not extended by greed to those not included by them. They are harsh at best; irreparable injury may often result from their abuse, and the temptation to resort to them in unauthorized cases can only be restrained by the courts holding parties to their legal responsibility, however willing their lawyers may be to shield them by the "advice of counsel," and share with them the product of claims that are saved by being "secured" by such illegal methods.

The next ground of the motion for a new trial relates to the juror Gray. It having been pressed with great zeal in exhaustive and able arguments, and being a matter of serious importance in its chal-

lenge of the whole practice of the court in the matter of impaneling its juries, and involving that practice in much doubt and confusion, by reason of a want of congressional legislation for its specific regulation, I have taken the trouble of going over the authorities which should govern the state and federal practice to see if our method of impaneling a jury should be hereafter followed, or some other mode adopted, and I find that substantially it now conforms to the requirements of the law, and is supported by the authorities.

It is brought to the attention of the court by an affidavit signed "James   his X   Gray, Sr.," in which affiant swears "that James Gray, mark. Jr., who served upon the jury in the above cause, * * * is a son of his," and less than 21 years of age, and neither a householder nor freeholder, "and has lived with and been a member of affiant's family ever since he was born, on March 21, 1863." Another affidavit is also filed, showing that said juror has not the property qualification necessary for a juror in Tennessee. Defendants and their counsel severally make affidavits, which are on file, that until the time of trial they did not know this juror, and "had no knowledge that he was a minor under 21 years of age, and that he was no householder or freeholder, until after the jury had returned their verdict." The defendant Booker also swears that he verily believes a fair trial was not had because Gray "was not a good and lawful juror, and did not possess the qualifications required by law; * * * that he was informed and believed that, under the federal court practice in selecting jurors, the members of the jury which were offered in open court to try said cause had been selected as prescribed by the acts of congress; and that the qualification of all said jurors had been declared and ascertained by the court."

The records of the court show that on November 2, 1883, there personally appeared in open court the clerk and jury commissioner, who were severally sworn to the faithful discharge of their duties, "and thereupon the said clerk and the said commissioner did then in open court each place one name in a box alternately of persons possessing the qualifications prescribed for jurors in the courts of the United States by section 800 of the Revised Statutes, until 365 such names were placed in said box. Whereupon the said box so containing the said names having been presented to the court, it is hereby ordered by the court that 30 such names be drawn from said box," and thereupon 30 such names were drawn from said box, as follows: —that of *James Gray* being one; upon which the court orders the issuance by the clerk of the writ of *venire facias*, returnable to the first day of the November term. Mr. Gray's acknowledgment of service upon him of the *venire* is signed "Jas. M. Gray." On November 26, 1883, the first day of the term, the record recites that "the *venire facias* for jurors was this day called, under the direction of the court,

when the following named persons appeared and answered to their names and were duly sworn, elected, and impaneled as jurors," the name James Gray being in the list of 12 names there set out, and that certain persons named in the *venire* were held as supernumeraries, certain jurors being excused. On December 5, 1883, the tenth day of the term, this suit was called for trial, it having been on the original call of the law docket set for trial on said day, when the record shows the following: "In this cause come the parties by their respective attorneys, and come also a jury of good and lawful men, to-wit, * * * James Gray, * * * who were duly elected, tried, and sworn well and truly to try the issues joined herein," etc.; the panel being composed of the identical 12 men impaneled the first day of the term, except that a supernumerary had been substituted in place of one on the regular panel, why or whether because of challenge the record does not disclose. The verdict as returned by the jury at the conclusion of the .trial, and on file in the cause, is signed by each of the 12 jurors, Gray's signature being "JAS. M. T. GRAY," and the records in the clerk's office show that in his affidavits for jury-fees this juror the first time signed his name "JAS. GRAY," the other three times his signature being "JAS. M. T. GRAY." A corresponding discrepancy exists on the marshal's pay-rolls.

The act of congress prescribing the manner of drawing jurors in courts of the United States provides "that all such jurors, grand and petit, including those summoned during the session of the court, shall be publicly drawn from a box containing at the time of each drawing the names of not less than three hundred persons possessing the qualifications prescribed in section 800 of the Revised Statutes, which names shall have been placed therein by the clerk of such court, and a commissioner to be appointed by the judge thereof," etc. Act June 30, 1879, (21 St. at Large, 43,) Supp. to Rev. St. 497, 498. Section 800 of the Revised Statutes so referred to enacts that "jurors to serve in the courts of the United States, in each state respectively, shall have the same qualifications, subject to the provisions hereinafter contained, and be entitled to the same exemptions, as jurors of the highest court of law in such state may have and be entitled to at the time when such jurors for service in the courts of the United States are summoned; and they shall be designated by ballot, lot, or otherwise, according to the mode of forming such juries then practiced in such court, so far as such mode may be practicable by the courts of the United States or the officers thereof. And for this purpose the said courts may, by rule or order, conform the designation and impaneling of jurors, in substance, to the laws and usages relating to jurors in the state courts from time to time in force in such state."

Among other rules promulgated by this court in October, 1871, was the following:

"It is ordered that grand and petit jurors be selected by the court in conformity with the laws of Tennessee. * * * It is further ordered that

the laws of the highest courts of the state of Tennessee in reference to the selection and impaneling of jurors and challenging of jurors shall constitute the rule of action and practice in this court."

Under the Tennessee Code, "every male citizen who is a freeholder or householder, and twenty-one years of age, is legally qualified to act as a grand or petit juror, if not otherwise incompetent under the Code." T. & S. Code, Tenn. § 4002. In addition to the provisions of the statute contained in said section 800 of the Revised Statutes, particularly applicable to juries, section 914 enacts that "the practice, pleadings, forms, and modes of proceeding in civil causes, other than equity and admiralty causes, in the circuit and district courts, shall conform, as near as may be, to the practice, pleadings, forms, and modes of proceeding existing at the time in like causes in the courts of record of the state within which such circuit and district courts are held, any rule of the court to the contrary, notwithstanding." Rev. St. § 914.

The rule of court cited above embraces the *challenging* of juries, as well as their *designation* and *impaneling*, although the former word is not found in section 800 referred to; but the case of *U. S.* v. *Shackelford*, 18 How. 588, decides that this provision, originally enacted July 20, 1840, empowers the federal courts to make rules regulating the challenges of jurors, though some doubts had been expressed previously on the subject by the circuit courts. In *U. S.* v. *Douglass*, 2 Blatchf. 207, it was held that the section applies both to the "mode and manner of obtaining the general panel of jurors in court," as well as to the "method of impaneling them in a specific case on trial." *Silsby* v. *Foote*, 14 How. 219; *U. S.* v. *Reed*, 2 Blatchf. 435; *U. S.* v. *Tallman*, 10 Blatchf. 21; *U. S.* v. *Woodruff*, 4 McLean, 105; *U. S.* v. *Collins*, 1 Woods, 499; *Huntress* v. *Epsom*, 15 FED. REP. 732.

It is unnecessary to decide, however, whether the question of a new trial for the alleged incompetency of the juror shall be wholly determined by the law of this state or by the common law, as by either test it is believed the motion should be denied. Motions for a new trial in Tennessee, even in criminal cases, have been always regarded with disfavor by courts when the motions are grounded on such disqualifications of a juror as a challenge *propter defectum* upon the trial would disclose. The want of these purely statutory qualifications, such as citizenship, age, property, sex, etc., which do not go to make up the really (not purely legal) necessary and essential qualities to enable the juror to do his duty intelligently and impartially in the case, have never in this state, or elsewhere, been treated with the same strictness as objections to the juror for bias, partiality, criminality, and the like causes reached by challenge *propter affectum* and *propter delictum* as designated in the common law. Indeed, the courts are swift to lay hold of an argument or fact in the record on which to ground a denial of these motions when based upon the *propter defectum* class of juror disqualifications, especially where they can see

that no injury has thereby resulted to the party objecting to the verdict. The leading case in our state on the subject is *McClure* v. *State*, 1 Yerg. 206, decided in 1829. The motion there was because one of the jurors was an atheist, and the record shows that defendant did not know of the objection until after verdict, and hence did not challenge the juror at the trial. The motion was overruled, the court treating the objection as one *propter defectum*, and saying, per WHITE, J.:

"It follows that the proper time for challenging is between the appearing and the swearing of the jurors. * * * These authorities show that this exception comes too late after the juror was sworn, the matter existing before. To this is answered that the defendant did not know it till afterwards. * * * Be that as it may, it is not a good ground for a new trial."

And per CATRON, J.:

"The objection comes too late. If the juror is not a good and lawful man, can he be challenged after he is sworn? The ancient and well-settled English authorities are that you cannot challenge the juror after he has been sworn unless it be for cause arising afterwards. * * * It would be most dangerous to pursue a different practice."

The motion for a new trial in *Gillespie* v. *State*, 8 Yerg. 507, (1835,) was based on the fact that two of the jurors were members of the grand jury who found the indictment, supported by the defendant's affidavits that they did not know this till after the court had charged the jury. In sustaining the action of the court below, overruling the motion, CATRON, J., speaking for the court, says:

"Nor is want of knowledge an exception to the general rule. * * * If the juror be not challenged he is competent to try the issue, nor can it be permitted to let the defendant annul the verdict against him on his affidavit of want of knowledge,—always to be had in cases of convicted felons, and which are not subject to be disproved."

In *Ward* v. *State*, 1 Humph. 253, (1839,) after the jury were sworn, on motion of the district attorney 10 jurors were allowed to be challenged because not freeholders. In a judgment overruling the action of the circuit court in this regard it is said:

"It is too well settled, both by the authorities of the courts of Great Britain and of the state of Tennessee, that it is too late, after a jury has been sworn, to challenge any of its members *propter defectum*, to be now a debatable point."

And in the case of *Calhoun* v. *State*, 4 Humph. 477, (1844,) a new trial was denied on a conviction of murder, with death sentence, on defendant's affidavit of want of knowledge, till after verdict, that one of the jurors was not a freeholder, the court using this language:

"This has been so repeatedly held in this state to be no cause for a new trial, and the reasoning therefor has been so repeatedly gone into in various cases heretofore examined and reported, that we deem it wholly unnecessary to add a word further thereto."

The somewhat novel case of *Hines* v. *State*, 8 Humph. 598, (1848,) shows that a juror sworn on his *voir dire* as to opinion, property,

kinship, etc., "in answer to questions by the court," qualified himself so far as inquired of, was pronounced a good and lawful juror by the court, accepted by both sides, and ordered into the box, but, before taking his seat, told the clerk he was not 21 years old. The court, on being informed of this, after further examination ordered him to stand aside. In reply to the argument that the time had passed for pronouncing a judgment on the juror's qualifications, the supreme court says:

"We think that, until the jury shall be sworn in the case, the court may, for any good cause, discharge a juror that has been selected, and select another in his place."

In the case of *Bloodworth* v. *State*, 6 Baxt. 614, one of the errors raised by the bill of exceptions was that two of the grand jurors had served in the court within 12 months, which was held to be no error, the court, in its opinion, saying, *inter alia :*

"As to a petit jury, it is the right of either party to the case to get clear of the incompetent juror by challenge, and, if he fails from proper cause to exercise this right at the proper time, it would be a conclusive waiver of it and the verdict of the jury be valid."

The late case of *Draper* v. *State*, 4 Baxt. 253, (1874,) shows that the motion for a new trial was made because a juror was neither a freeholder nor householder, and that the defendant was ignorant of this at the trial. It does not appear from the record what answers the juror made on his preliminary examination, but the court, in disallowing a new trial, assume that the juror, supposing himself competent, answered accordingly.

The cases of *Howerton* v. *State*, Meigs, 262; *Troxdale* v. *State*, 9 Humph. 411; and *Brakefield* v. *State*, 1 Sneed, 215, relied upon by the defendants here, were all cases where the objections to the juror were made because of bias or partiality or prejudice, evidenced by the formation and expression of opinion by the juror. Such objections, which give a party the right to challenge *propter affectum,* go to the purity of the verdict, and its fairness and correctness, and are governed by a different principle than those presented in this case.

The rule thus shown to be the law of Tennessee is, unquestionably, the well-settled English doctrine, and the result of more than two centuries' growth. A few of the earlier common-law cases will be referred to, illustrating the principle: *Aylett* v. *Stellam,* Style, 100, was decided in 24 Car. I., as follows:

"Twisden, upon a rule to show cause why there should not be a new trial, said that two things were alleged on the other side that there ought to be a new trial: (1) That two of the jurors were kin to the plaintiff. * * * To the first of which he answered that the jurors were not of kin, and produced an affidavit for proof. ROLLA, J., interrupted him, and said: 'It is not now material whether they be of kin or no, for the defendant would have taken advantage of that upon his challenge at the trial.' "

So, also, in *Loveday's Case*, Id. 129 :

"The court was moved upon an affidavit that one of the jurors that gave the verdict against the plaintiff had a suit in law depending at that time with the plaintiff, and therefore that the trial was not indifferent; and therefore it was prayed there might be a new trial. But the court said it could not be, and asked the party why he did not challenge the juror for this cause at the trial, for want of which he had now lost that advantage."

In an old case decided in 1681, (*Cotton* v. *Daintry*, Vent. 29,) the issue tried by the jury was whether Sir A. B. was a bankrupt. The motion for a new trial was based on two grounds,—one being that the foreman of the jury was brother-in-law to one of the creditors of Sir A. B., but "Moreton and Rainesford held neither of these reasons sufficient; for the first, it was their own laches that they did not challenge upon it. * * * Twisden, for the *last reason*, held a new trial was to be granted. * * * Kellynge held both reasons sufficient for a new trial, which could not be, in regard the court was divided; whereupon, judgment was entered for the plaintiff, and execution taken out."

Upon an exhaustive review of all the authorities, the authors of a late work on juries conclude that "the rule is very well settled that, after a verdict, these formalities will not be permitted to affect the result, although they did not sooner come to the knowledge of the party complaining, unless positive injury can be shown to have accrued therefrom." Thomp. & M. Jur. § 295, and cases cited *in nota*.

But even if the juror Gray, who sat in the trial of this suit, was not, in fact, summoned by the marshal, nor drawn from the box, but appeared instead of his father, who was so drawn and summoned, and this fact had been sufficiently proved upon the motion for a new trial by the defendants, it is doubtful if the motion should, for that reason, prevail, and the court suspects, from what passed between counsel at the hearing of this motion, though it is not in the record, that such was the fact, and so accounts for this juror's presence in the panel; for it is a common practice in the state courts for jurors summoned to send substitutes whom the court accepts. The English cases present a curious line of decisions peculiarly applicable to such a state of facts.

In *Hill* v. *Yates*, 12 East, 229, (1810,) the motion for new trial was made "because the son of one of the jurymen returned upon the panel had answered to his father's name when called, and had served upon the jury," as appeared by affidavits. "The court, however, considering the extreme mischief which might result to the public from setting aside, upon a motion for a new trial on such ground, inasmuch as the same objection might happen to lie against every verdict on the civil and criminal sides at the assizes, and recollecting that the same objection had been taken and overruled since the case in Willes, refused to entertain the motion." Afterwards, upon consulting all the judges, Lord ELLENBOROUGH said they would not interfere in this mode; "that if they were to listen to such an objection they

might set aside half the verdicts 'given at every assizes where the same thing might happen from accident and inadvertence, and, possibly, sometimes from design, especially in criminal cases."

In 1816, in the case of *Dovey* v. *Hobson*, 6 Taunt. 460, *Hill* v. *Yates* was in terms expressly affirmed, but a new trial was granted under these facts: A summons had been left at the house for B., who had recently moved out; M. at the time occupying it. M. appeared, answered to the name of B., was sworn and impaneled in the cause. After the case had been gone through, but before verdict, the fact was discovered.

But in the case of *Rex* v. *Tremaine*, 16 E. C. L. 318, the facts, perhaps, bear a closer resemblance to the case at bar than any other to be found. It was a motion for a new trial on a conviction for perjury. The name of John Williams appeared in the tales panel, and, when called, a person appeared, answered thereto, went into the box, and joined in the verdict. After verdict it was discovered that the one who served was Richard Henry Williams, a son of John, and who was but 20 years and 6 months old, had no freehold or copyhold estate, and had not been summoned. It appeared from the young man's affidavit that his father had been served, but, being ill, had requested the boy to attend in his place, and that affiant knew no harm in so doing. All collusion was denied. In granting a new trial, ABBOTT, C. J., said the mischiefs enumerated in *Hill* v. *Yates* ought not to control in support of "a verdict pronounced by a jury on which a person incompetent, both by reason of nonage and want of qualification, has served, * * * particularly in a case so highly penal."

In *Regina* v. *Mellor*, cited in Thomp. & M. Jur. 334, there was in 1858 a conviction and sentence to death for murder. The panel contained the names of Thorn and Thornilly, both of whom were summoned and qualified. When Thorn's name was called, Thornilly by mistake answered and was sworn, without challenge or objection, and the mistake was not discovered until after verdict. Of the 14 English judges who sat in review upon this case 6 were of the opinion that a new trial should be granted, 6 that it should not, and 2 gave no opinion. And in *Wells* v. *Cooper*, Id. 335, the name of Fox being called as a juror, one Cox answered and served by mistake. A new trial was refused because "the court will not in its discretion grant a new trial in a case where a person not of the panel served upon the jury, unless substantial injustice has been done by a wrong juror having served." *Norman* v. *Beamon*, Willes, 484; *Parker* v. *Thornton*, 2 Ld. Raym. 1410.

But one of the earliest and perhaps the leading American case on the subject of new trials for want of proper qualifications for a juror is *Hollingsworth* v. *Duane*, Wall. C. C. 147, (1801,) the opinion by Judge GRIFFITH being an able review of all the early English authorities, and an exhaustive exposition of the whole subject. The suit was an action for damages for libel contained in a newspaper

publication, and is reported no less than six times on different questions in the same volume of reports. The question arose on a rule for the plaintiff to show cause why his verdict should not be set aside on the ground that the foreman of the jury who rendered the verdict was an alien, and that defendant was ignorant of it when the jury was impaneled. The court refused to disturb the verdict, saying:

"I admit that it is a good cause of challenge that a juror is an alien. * * * But it is one thing to set aside a juror on a challenge made to him and substantiated by proof before he is sworn, at the proper time and place, and by the proper mode of trial, and another to allow the juror to be sworn without objection, and then set aside the verdict of the whole jury for a defect of qualification which, had it been suggested in time, would have been attended with no consequence but that of calling on the next juror named in the panel. It is easy to see to what injurious consequences this practice would lead, or allowing a challenge after verdict. The causes of challenge are infinite, and perhaps not one jury in ten are sworn that, if the situations, connections, interests, and qualifications of each juror were critically inquired into after verdict, some one or more would not be found, in some capacity, the subject of challenge. * * * But as to the ordinary and legal disqualifications of jurors, such as citizen, freeholder, relation, servant, and every relation of a general nature, and capable of ascertainment by ordinary care and inquiry, these cannot be permitted upon the plea of ignorance after verdict. * * * If simply swearing to ignorance of a fact were to put a party on the same ground in regard to challenge after as before verdict, it is easy to see that the rule of invoking challenges at the trial would be good for nothing; the whole law would be changed; the mode of trying the challenges, the time, the opportunity for the juror and the party to be heard, and verdicts would many times be overset after a fair trial merely on the plea of a culpable ignorance. No; if a party comes to set aside a verdict on the ground of a disqualified juror, he must make a very special case indeed. He must show from the nature of it that ordinary diligence could not have effected the discovery; that he was surprised; or that, after due inquiry and pains, he had missed or been misled as to the fact."

In *Orme* v. *Pratt*, 4 Cranch, C. C. 124, (1830,) the motion for a new trial, because one of the jurors was brother-in-law of the plaintiff, a fact not known to defendant nor his counsel, was overruled. In the criminal case of *U. S.* v. *Baker*, 3 Ben. 68, Judge BLATCHFORD denied the motion for a new trial because one of the jurors was deaf and did not and could not hear the evidence, although the defendant was ignorant of this when the jury was sworn and impaneled. The court in this case held that "the non-possession of any natural faculty stands, in respect to a juror duly summoned, in the same category with alienage or infancy or sex." But see the case of *Turnpike Co.* v. *Railroad Co.* 13 Ind. 90, where a contrary doctrine was held as to a juror who could not read or write English.

The early case of *Gilbert* v. *Ryder*, Kirby, (Conn.) 180, (1786,) presented a motion in arrest of judgment because one of the jurors had not taken the statutory oath of fidelity to the state, which fact was unknown to the defendant at the time of trial. The motion was denied by the whole court. "The exception does not go to the partiality of the juror, nor affect the obligation he was under to find a verdict

according to truth; and it is not stronger than the want of a freehold, which, though a ground of challenge, hath been repeatedly adjudged insufficient after verdict." *People* v. *Jewett*, 6 Wend. 387.

In *James* v. *State*, 53 Ala. 380, (1875,) a new trial was refused under these circumstances: The State Code, § 4063, prescribed certain qualifications for jurors, and a subsequent act made it the duty of the court, "before administering the oath prescribed by law" to any juror, to ascertain that he possessed the qualifications prescribed by the Code, "and the duty required by the court by this act shall be considered imperative." In selecting the panel, the court caused eight questions to be put to each person. None of these questions inquired of the jurors in respect of their qualifications under said section, nor did the defendant ask nor request the court to ask any such questions, neither objecting nor accepting.

The cases of *Orcutt* v. *Carpenter*, 1 Tyler, (Vt.) 250, (1801;) *Guykowski* v. *People*, 1 Scam. (Ill.) 476; and *Watts* v. *Ruth*, 30 Ohio St. 32, (1876,) are cited and relied upon by the defendants here. In the Vermont case a juror was a freeholder when his name was put into the box, but not when he was drawn, summoned, and served as a juror in the case. The new trial was refused *on this ground*, because "the juror being legally qualified when put into the box, his subsequent disqualification by divesting himself of his freehold, and thus not being a freeholder when drawn, summoned, and sworn, should have been taken advantage of in challenge, and cannot prevail after verdict." The Illinois case is a direct authority for granting a new trial, because one of the jurors was an alien when sworn, of which fact the defendant was ignorant at the time; but in *Greenup* v. *Stoker*, 3 Gilman, (Ill.) 202, the decision is by the same court, criticised *and confined strictly to capital cases*, while in *Chase* v. *People*, 40 Ill. 356, the doctrine is wholly repudiated and overruled.

In the Ohio case, read in the argument, the juror was cited as a talesman, and was not 21 years old, but was accepted without inquiry as to his competency, though personally known to the party and his counsel. No objection was made nor question asked of him, because he was thought to be 21 years of age. In denying the motion for a new trial on this ground the court says:

"If a person, not having this qualification, is retained upon the panel without the knowledge of the party or his counsel, after due diligence and inquiry has been made to ascertain the juror's qualification at the time of impaneling the jury, a new trial should be granted. If, however, no inquiry was made of the juror, and thereby arose a want of reasonable diligence in ascertaining the qualification of the juror at the time of impaneling the jury, the party will be held to have waived all objection to the juror. This rule extends to each and every element that goes to constitute a qualified juror, save such as *the statute* requires the court *sua sponte* to ascertain. * * * It is not a sufficient showing, on a motion for a new trial, that the party, at the time the jury was impaneled, was ignorant of the fact of the incompetency of such person for a juror, and that he believed him to be competent. He must, at the proper time, have examined the juror touching his qualifications. Noth-

ing short of such an investigation will furnish a showing of reasonable diligence."

Here we have no statute requiring *the court* to ascertain the qualifications of its jurors,

But the defendants here in argument insist that, conceding the doctrine to be as announced in this opinion, they do not fall within it because Gray, being "duly sworn, elected, and impaneled as a juror" on the first day of the term when the *venire* was returned, they had a right to rely upon this without anything further, and that, therefore, they have waived nothing; or, in other words, have been guilty of no laches or negligence, or want of proper diligence. But the answer to this argument, in the light of the foregoing cases, is obvious; and the solution of the question depends upon *the time when* the right of challenge accrues to a party, and what is meant by the impaneling of a jury and an examination of a juror upon his *voir dire*. Nothing is better settled than that a party cannot, either with knowledge of a juror's disqualification or from supineness and culpable negligence in ascertaining whether he is qualified or not, speculate upon the result of a trial, holding in reserve whatever he may know or can afterwards ascertain to vitiate the verdict, if against him. Our statute requires the names of jurors to be "publicly drawn from a box," and under our and the Tennessee practice the *venire facias* must issue a certain number of days before the commencement of the term. The evident object and purpose of these and various other somewhat similar provisions is to *publish* to litigants and others interested the jurors selected by law to try the issues presented for determination in the court, thereby giving ample opportunity for investigation and inquiry as to their qualifications, characters, connections, relations, etc., "that so they may be challenged upon just cause." 3 Bl. Comm. 355.

Besides, the proper time for challenge is after issue joined in a cause, especially in a civil suit, and when the cause is called for trial. Thomp. & M. Jur. § 286, and cases cited. Mr. Chitty, in his work on Criminal Law, on this precise subject says:

"*The time for the trial having arrived,* the clerk calls the petit jury on their panel by saying: 'You good men that are impaneled to try the issue between our sovereign lord, the king, and the prisoner at the bar answer to your names upon pain and peril that shall fall thereon.' When this is done, and a full jury appears, the clerk of the arraigns calls the prisoner at bar and says to him: 'These good men and true, that you shall now hear called, are those which are to pass between our sovereign lord, the king, and you; if, therefore, you, or any of you, will challenge them, or any of them, you must challenge them as they come to the book to be sworn, before they are sworn, and you shall be heard.' * * * From the words of the clerk's address to the prisoner, it is evident that this is the proper time to exercise the right of challenge." 1 Chit. Crim. Law, 532, 533.

And an examination of all the cases cited in this opinion shows that the objections were always taken "on the trial," or "when the

jury was impaneled," or "before the jury was sworn," or "when the juror was sworn on his *voir dire*," and the like. The statutes, too, are full of expressions regarding the procedure in jury trials, plainly indicating that the proper time for challenge is between the calling of the juror and his taking the oath in the case. For example, peremptory challenges are allowed "*on the trial of*" felony cases; when a prisoner exhausts his challenges "*in the trial of a capital case;*" after any excess is disallowed, "*the cause shall proceed for trial,*" and in treason, "*a list of the jury*" shall be delivered to the defendant "*before he is tried.*" Rev. St. U. S. §§ 819, 1031, 1033. So the challenge for cause in the state courts is given in case of "any person *presented* as a petit juror," and peremptory challenges are prescribed for "*a civil action tried in the courts of this state,*" as well as "*in the trial of criminal prosecutions.*" Tenn. Code, 4009, 4012–4014.

Originally, at common law, all questions arising by challenge were tried by triers, composed of two indifferent persons appointed by the court, until one juror was obtained, when he took the place of one of the triers, and, when another was accepted, these two jurors so first obtained were the triers before whom witnesses were sworn, and whose decision was final. Challenges in the federal courts are now tried by the court without the aid of triers. Rev. St. 819. So, strictly speaking, and at common law, a jury is impaneled only when they have been elected and are ready to be sworn, though the more modern use of the term often indicates the jury as sworn in a particular case. Thomp. & M. Jur. § 257; 2 Bac. Abr. 742, tit. "Juries," B, 8; Co. Litt. 158*b; State* v. *Potter*, 18 Conn. 169, 175; 1 Abb. Law Dict. 200, "Challenge;" 2 Bouv. Law Dict. 271, "Panel."

The writ of *venire facias* at common law was merely the sheriff's "warrant to warn the jury," and the names were in fact selected by him, and he returned them in a panel—"a little pane or oblong piece of parchment"—attached to the writ. But these jurors were not in fact summoned by the sheriff under the writ of *venire,* but a subsequent compulsory process of *distringas* or *habeas corpora juratorum,* as the case might be, issued to bring them in; and until the English statute of Geo. II. *c.* 25, these writs issued as, of course, in every separate cause; hence the old form of granting a new trial was the award of a *venire de novo.* This act of Geo. II. "appoints that the sheriff or officer shall not return a separate panel for each separate cause, as formerly, but one and the same panel for every cause to be tried at the same assizes, containing not less than 48 nor more than 72 names, and that their names being written on tickets shall be put into a box or glass, and *when each cause is called* 12 of these persons whose names shall be first drawn out of the box shall be sworn upon the jury, unless absent, challenged, or excused." 3 Bl. Comm. 357, 358.

It is the practice of the judge presiding in the courts of this district, as the return of the *venire* is called by the marshal in open

court at the commencement of each term, to cause each of the jurors present to be sworn and examined as to his citizenship, property qualification, and previous service in the court. Excuses offered by individual jurors are then passed upon, proceedings ordered in case any summoned are absent through default or contumacy, and new names for an *alias venire* drawn from the box in case the number then present are reduced below the jurors probably demanded by the business of the court. Indeed, the practice originated in a desire to expedite and facilitate the trial of cases by supplementing the duties of the clerk and jury commissioner in their endeavor to present to parties only such jurors as are qualified under the law. It is in no sense whatever an examination of the juror on his *voir dire*; it is in law no trial of a juror for the purposes for which originally triers were appointed, nor would the circumstance give a party in court the right to challenge a juror at that time, nor has a challenge ever in this court been made on such a call.

Nor do I think any advantage whatever can result or accrue to a party having a case in court from this customary action of the judge. The *venire* is issued out of the court to a public officer for service, and contains names for jurors publicly drawn from a box by the crier in open court. The venire is returned into the court, and is called by the marshal in open court, when and where the jurors appear and answer. Why any one of these various steps to secure a lawful jury can be relied upon by a party, more than another, as an excuse for want of diligence in ascertaining a particular juror's statutory qualifications, is neither obvious to me, nor suggested by the argument nor in the briefs of the defendants. As well might it be insisted that the action of the clerk and jury commissioner in our practice, or of the county court, the *nisi prius* court, or sheriff, as the case may be, in our state practice, would excuse a party from challenging a juror for any statutory cause on the theory that no juror other than those qualified would ever by these means be presented to a party. It is true, every juror is *prima facie* competent and qualified. The duty of ascertaining to the contrary devolves on him who would take advantage of a want of qualification.

There has been much discussion in the books whether, in denying a new trial for such cause, the action of the court should be based on the party's waiver, as in this state is the rule, or on his want of diligence, as the supreme court of Michigan holds. Of course, it makes practically but little difference, since the result, in a case like this, would be the same on either ground, and would result in a new trial being denied.

But even if ignorance were an excuse to a party, in all cases, for not challenging a juror for a cause *propter delictum* or *propter affectum*, which is by no means clear in Tennessee, there must be shown, in addition, that the party has been injured by reason of that particular juror taking part in the verdict. That he was not qualified is not

enough; it must be further shown that the verdict was .vitiated by reason of the juror's want of proper legal qualification.   *Hill* v. *Yates,* 12 East, 229; *Wells* v. *Cooper, supra; Brakefield* v. *State,* 1 Sneed, 215; *Howerton* v. *State,* Meigs, 262; *Hollingsworth* v. *Duane,* Wall. C. C. 160, 162, 163; Thomp. & M. Jur. § 295 *et nota.*

Here, therefore, had the juror been examined in court upon his *voir dire* strictly, on the impaneling of the jury in this cause, and had qualified himself as to age and property, when in fact this was untrue, that alone would not, under the facts set out in the affidavits filed in support of this motion, warrant the court in granting it, in the absence of any showing whatever of any injustice thereby accruing to the defendants, and of improper motives on the part of the juror.

· The next ground of the motion is based on the action of the court in allowing the plaintiff to amend his declaration, as to which the court is satisfied that it committed an error for which a new trial should be granted.   The application was allowed with great reluctance, and solely to prevent, if possible, an abortive trial.   Technically, if the amendment had been disallowed the result would have been barely nominal damages to a plaintiff entitled, perhaps, to substantial recompense for an injury to his property at a critical time in his affairs, if the jury should find the issues in his favor; and since the defendants had examined numbers of witnesses and were before the jury with abundant testimony, it seemed important that the plaintiff should be allowed to put his defective declaration in shape to support whatever case he had made by his proof.   The amount of the verdict was larger than the court had supposed it would be, and affords no hope that the parties, notwithstanding this error, might adjust this litigation.   The well-known practice of the court not to disturb verdicts fairly rendered makes it incumbent on the court to scrutinize its own conduct with care on these. motions for a new trial, particularly where there is no review by writ of error open to the parties, and, whatever the verdict may be, to set it aside if there be substantial error.

The plaintiff chose to go to trial on the declaration as he had made it, after its defects had been called to his attention, and when, under the inconvenience of a continuance, it might have been amended as he wished.   When, after the case was nearly ended, the conclusion was reached that it was fatally defective, it was the defendants' right to hold him to the pleadings, unless he should take a nonsuit, suffer costs, and begin again; and it was putting the defendants to a disadvantage to deprive them of this benefit of the situation by allowing the amendment.

Besides, the affidavits show that there is other proof they might have had, if they could have had another trial by forcing the plaintiff to a nonsuit, though they show no reason for not having presented that proof on this trial.   They argue that they need show no other

reason than that, on the declaration as it stood, they needed no proof at all, as nothing but nominal damages were recoverable against them. This is perhaps a full answer; but, whether it is or not, the allowance of the amendment at that stage of the proceedings was erroneous unless it had been accompanied by a continuance of the case for another trial, or, at least, a reopening of it for an opportunity to the defendants to introduce further proof after the declaration had been amended. *Fowlks* v. *Long,* 4 Humph. 511; *Morrow* v. *Hatfield,* 6 Humph. 108; *Smith* v. *Large,* 1 Heisk. 6.

Motion granted.